UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JOHN WAGNER, JR., | No. C 09-4662 SI (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION AND DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| RANDY GROUNDS, Warden, | |
| Respondent. | |

# INTRODUCTION

David John Wagner, Jr., a prisoner of the State of California, filed this habeas action under 28 U.S.C. § 2254 to challenge his 2005 conviction in the Lake County Superior Court. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition is denied.

# BACKGROUND

I.  The Crimes

On December 13, 2004, the Lake County District Attorney filed an information charging Wagner with five counts: willful, deliberate, and premeditated attempted murder (Cal. Pen. Code §§ 187(a), 664(a);[1] count 1); aggravated mayhem (§ 205; count 2); willful infliction of corporal injury on a co-habitant resulting in a traumatic condition (§ 273.5(a); count 3); assault with a deadly weapon, i.e., a knife (§ 245(a)(1); count 4); and dissuading a witness by force or threat of force (§ 136.1(c)(1); count 5). The information alleged that counts 1, 3, 4, and 5 included the enhancing allegation that Wagner inflicted great bodily injury under circumstances involving

---

[1] Unless otherwise specified, further statutory references are to the California Penal Code.

domestic violence (§12022.7(e)); that count 1 included an enhancement for personal infliction of great bodily injury (§ 12022.7(a)); and that counts 1, 2, 3, and 5 included an enhancement for use of a deadly and dangerous weapon in the commission of the crime (§ 12022(b)(1)). The information also alleged nine factors in aggravation (Cal. Rule of Court 4.421(a)(1, 2, 6, 7), (b)(1-5)).

The California Court of Appeal set out the facts related to the underlying criminal charges:

> Paris Dalton began renting a room in a two-bedroom mobile home occupied by defendant on September 3, 2004. The mobile home was at space number 13 of a mobile home park. According to Dalton, she had known defendant for about a month before she moved in, and he had been "courting" her. When she moved in he was "very sweet," "trying to get with [her]." After she moved in, defendant would sleep with Dalton on the mattress in her room almost every night, and they had sexual relations on about three occasions. Dalton characterized their relationship as "boyfriend/girlfriend," and they discussed having an exclusive relationship with each other.[2] Defendant also had access to another trailer in the park, at space number 45, and spent time there, but he would return to number 13 late at night. Dalton and Wagner did not go out in public together. On one occasion when defendant's grandfather came to the trailer, defendant told Dalton to hide in the bedroom, because he had not told his grandfather he had rented the room to her.
>
> On the evening of September 12, 2004, defendant and Dalton had a discussion about her belongings. Dalton was planning to take a two-week trip, and she had packed up her valuables and put them by the door to be put in storage, although she planned to leave her clothes and some other items in the trailer. Defendant told her he wanted her to put the belongings she had packed up into an unlocked storage shed so his grandfather, who owned the trailer, would not know he had rented out a room. The discussion became an argument, and defendant told Dalton he would call the police, tell them she was an intruder, and have her removed. The incident escalated into a physical fight, and the two traded blows. Dalton pinned him down, but let him up twice. Each time he began hitting her, striking her face until it bled.
>
> Dalton went to a telephone booth to call the police. She dialed 9-1-1, but was unable to get through. As she stood there, she saw defendant coming toward the phone booth. He asked who she had called, and she told him she had tried to call a friend. He told her to come home to sleep, and patted her on the back, then moved so she was in front of him. He then stabbed her in the back with a knife. She sat on the ground and felt the blood spurting from the wound. She looked up at defendant, and he cut her throat with the knife.

---

[2] Defendant later told a police officer that he had slept in Dalton's bed a couple of times, that he and Dalton had engaged in sexual relations once, that she wanted to be his girlfriend, and that he "wanted to take things slow."

Dalton told defendant she would bleed to death if she did not get to a hospital right away and he told her to go back to the house with him. Dalton repeated that she needed to go to a hospital, and defendant agreed to call an ambulance if she would say that he was not responsible for her injuries. She agreed, and they went to the manager's unit at the entrance to the trailer park. Dalton was "in shock," and she was holding her back. The manager called 9-1-1, and at some point defendant left. An ambulance arrived, and Dalton asked to be taken to the hospital quickly because she was losing a lot of blood. She was afraid she would bleed to death. She spoke with a police officer in the hospital and told him who had injured her. At the time, she thought there was a good chance she would die.

Dr. Wolfgang Schug, who treated Dalton at the emergency room, saw evidence of a blow to her nose, an eight-centimeter cut across her throat, and a fairly deep stab wound in her back. The wound in her back was at least six centimeters deep and extended into the chest cavity. One of Dalton's lungs had collapsed, and the wound was potentially life-threatening. The wound to her neck was about half an inch from both her trachea and her jugular vein, and it could have been fatal if it had reached either location. Dr. Schug sutured the neck wound and admitted Dalton to the hospital to have her back wound treated.

Officer Raymond Brady of the Clearlake Police Department arrived at the office of the mobile home park's manager a little after 2:00 on the morning of September 13. He saw Dalton sitting there, bleeding from her neck area, "covered in blood," and with a wound in her back. Dalton told Brady that defendant, who lived at number 13, had stabbed her. She said she had been his roommate for 10 days, and that they did not have a relationship. She appeared to be distressed and "kind of in shock." Officers looked for defendant at the trailers in spaces 13 and 45, but did not find defendant in either place. They searched the mobile home park for defendant for about an hour, but did not find him. In an enclosed area, they found a plastic tobacco bag containing a T-shirt that was wet and had what appeared to be bloodstains, and a knife that appeared to have blood on it. DNA on the knife and the shirt was later tested, and was found to be consistent with Dalton's. An officer who examined the unit at space 13 saw what appeared to be spots of blood in the gravel on the driveway, on the door trim, and on blinds hanging in the doorway. There was a pile of loose tobacco on a mattress in a bedroom, and the shower area was wet.

Around 7:00 in the morning, officers returned to the mobile home park and found defendant at the trailer at space 45. After being advised of his rights and waiving them, defendant spoke with Detective James Bell. He admitted the initial physical altercation with Dalton, but denied attacking her with a knife. He acknowledged having had sexual relations with Dalton once, but said that it was a mistake, and that aside from that one incident he had been sleeping either on the couch or in his other trailer. Dalton had wanted to be his girlfriend, but he told her he wanted to "take things slow." The clothes he was wearing during the interview contained stains that were later tested and found to contain Dalton's DNA.

Officer Brady spoke with Dalton again at the hospital, and she told him that she and defendant had had sexual relations four days previously. She also described herself as his tenant and said they had lived together for five days.

Arsen Barbeau, one of the paramedics who treated Dalton at the mobile home park, testified that when he arrived, Dalton's neck was not bleeding and he

3

>did not do anything to treat the injury. However, when shown a picture of Dalton on the night of the incident, he agreed that there was blood on the neck wound. He heard Dalton say that defendant had stabbed her.

Cal. Ct. App. Opinion, ¶. 2-4 (footnote renumbered).

II. <u>Procedural History</u>

On August 31, 2005, a Lake County jury found Wagner guilty of all counts and all enhancements.

On July 6, 2006, the trial court sentenced Wagner to an aggregate term of six years plus life in prison.

On March 17, 2008, the California Court of Appeal reversed the aggravated mayhem conviction, but otherwise affirmed the judgment. The reversal had no effect on the sentence because the trial court had stayed the sentence for the mayhem conviction. Wagner did not seek review of the state appellate court's opinion in the California Supreme Court.

Wagner subsequently filed a petition for a writ of habeas corpus in the Lake County Superior Court. On August 20, 2008, the state superior court denied the petition in a reasoned opinion.

On September 26, 2008, Wagner filed a petition for a writ of habeas corpus in the California Court of Appeal. On December 11, 2008, the state appellate court denied the petition.

On January 7, 2009, Wagner filed a petition for a writ of habeas corpus in the California Supreme Court. On July 15, 2009, the state supreme court summarily denied the petition.

On September 30, 2009, Wagner filed this action. In his petition, Wagner asserted three claims that the court found cognizable: (1) he received ineffective assistance of trial counsel in that trial counsel failed to adequately prepare a defense expert to testify at trial (Claim 1); (2) his right to due process was violated by the admission of evidence regarding his propensity to commit domestic violence (Claim 2); and (3) his right to due process was violated by the admission of evidence of the victim's out-of-court statements (Claim 3). The court then ordered respondent to show cause why the petition should not be granted.

On June 3, 2010, respodent moved to dismiss the petition, arguing that state judicial

4

remedies had not been exhausted for Claims 2 and 3.  Wagner conceded non-exhaustion as to Claims 2 and 3, and chose to amend the petition to delete the unexhausted claims and proceed with just Claim 1, as to which state judicial remedies had been exhausted.  He also filed an amended petition that deleted the two unexhausted claims and presented just his one exhausted claim (Claim 1).

On December 6, 2010, the court granted respondent's motion to dismiss, dismissed the unexhausted Claims 2 and 3, and noted that the action "will proceed with just the claim in the amended petition, i.e., the claim for ineffective assistance of counsel." (Dec. 6, 2010 Order at 1.)

Respondent filed an answer to the amended petition.[3]

Rather than file a traverse, Wagner filed a motion for appointment of counsel.

On March 28, 2011, the court denied Wagner's motion for appointment of counsel, and ordered him to file his traverse no later than May 6, 2011.  To date, Wagner has neither filed a traverse nor a request for an extension of time to do so.  The case is now ready for review on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action concerns a conviction obtained in Lake County, which is in this district.  See 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

---

[3] Wagner named Ken Clark, former warden of the California Substance Abuse Treatment Facility and State Prison in Corcoran, California, as the respondent in this action. Randy Grounds, the current warden of the Correctional Training Facility in Soledad, California -- where Wagner is currently incarcerated -- has been substituted as respondent in place of Wagner's prior custodian pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

5

judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). As mentioned above, the parties do not dispute that state court remedies were exhausted for the remaining ineffective assistance of counsel claim asserted in the amended petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

6

**DISCUSSION**

I.  Ineffective Assistance Of Counsel

Wagner claims his Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated when his trial counsel failed to adequately prepare a defense expert to testify at trial.

    A.  Background Facts

The Lake County Superior Court denied Wagner's claim as follows:

> Viewing the allegations of ineffective assistance of counsel in the light most favorable to the Petitioner, the court finds that no prima facie claim for relief is stated. Recognizing that the Petitioner's mental condition would be an issue in the case, defense counsel [Stephen Tulanian] retained the services of an expert, Dr. Kastl, who interviewed the defendant, conducted tests, and later testified for the defense at trial. After the verdict, the defendant's family supplied additional information about the defendant. Mr. Tulanian appropriately sent this new information to Dr. Kastl for analysis, and based on this new information, Mr. Tulanian unsuccessfully moved for a new trial.
>
> The above facts do not establish a prima facie showing of ineffective assistance of counsel. The actions of Mr. Tulanian are what would be expected of a competent defense counsel.
>
> The Writ is therefore denied.

Cal. Sup. Ct. Opinion at 1-2.

Aside from a brief one-paragraph description above, there is no other state court opinion which summarizes the facts underlying Wagner's ineffective assistance of counsel claim. As explained in the reasoned opinion by the state superior court above, Wagner's trial counsel moved for a new trial -- his second motion for a new trial.[4] The hearing on this motion was held on the same date as sentencing, July 6, 2006. In support of respondent's answer to the amended petition, a transcript of the aforementioned hearing on the second motion for a new trial, Resp't Ex. B (July 6, 2006) at 4-44, as well as the reporter's transcript of the entire trial proceedings – including Dr. Kastl's testimony, RT 1-1672, and the clerk's transcript, CT 1-627 – have all been

---

[4] On May 18, 2006, Wagner's trial counsel filed his first motion for a new trial, which related to his belief that "a [not guilty by reason of insanity] defense might have been appropriate." CT 999. This first motion was denied by the trial court.

7

lodged for the court's review. Relying on these transcripts, respondent has summarized the background facts relating to the ineffective assistance of claim in his memorandum of points and authorities in support of the answer. Because Wagner did not file a traverse, there is nothing in the record that indicates that he disputes the underlying course of events. The court has reviewed the facts and agrees with respondent's interpretation. Accordingly, the court includes here respondent's summary of the facts relevant to Wagner's ineffective assistance of counsel claim:

> Petitioner's psychiatric expert, Dr. Albert Kastl, examined petitioner and reviewed some background information and concluded that petitioner was mentally deficient and could not have premeditated his attack on the victim, Paris Dalton. Dr. Kastl told trial counsel that additional historical psychological records would be helpful, but he did not expect it to change his diagnosis. After petitioner was convicted, trial counsel found additional evidence of petitioner's troubled childhood. He provided that information to Dr. Kastl and moved for a new trial, but the motion was denied.
>
> . . . .
>
> Dr. Kastl acknowledged that at the time of trial, he was already convinced that petitioner "did not possess[ ] the cognitive ability to premeditate and plan." (Exh I-4 at 19.) Dr. Kastl also conceded that at the time of his trial testimony, he "believed that the information [he] possessed . . . was sufficient to support this opinion . . . ." (Id.) . . . .
>
> Petitioner suggests that trial counsel ignored Dr. Kastl's request for additional documentation of petitioner's psychological history. However, Dr. Kastl wrote only that "it would be extremely helpful in this regard to obtain copies of psychological evaluations of the past." Exh A at 219. Dr. Kastl also mentioned petitioner's special education and social security status only in the context of inferring that earlier psychiatric evaluations must exist because those programs generally required such examinations. Id. at 219, 221; but see Exh I-13 (social security records were lost). However, Dr. Kastl never indicated that the information was essential, nor did he tell trial counsel it was required for his diagnosis. See Exh A at 949 (trial counsel stated that "prior to the time Dr. Kastl testified at trial, he did not state to me that he required any further information, nor did he ever ask me whether I had obtained any such records."); Exh I-4 at 19 (Dr. Kastl admitted that he had already made a conclusion that petitioner was incapable of premeditating the assault).
>
> Furthermore, trial counsel made a tactical decision to make identity the primary defense. . . . .
>
> . . . .
>
> Accordingly, trial counsel focused on eliciting evidence and arguing that petitioner was not the assailant. For example, counsel had the mobile park manager testify that Dalton told him that petitioner was not the one who attacked her. Exh B at 1193. The manager also testified that Dalton smelled of alcohol and

8

> slurred her words. Id. at 1196-1197. Trial counsel further attacked Dalton's credibility by having four neighbors testify that she had a reputation for dishonesty. Id. at 1220, 1231, 1343, 1438; see id. at 1540 (trial counsel impugned Dalton's credibility by arguing she was proud of recovering from drug addiction but had Morphine, Valium, and alcohol in her system at the time of the attack); id. at 1555-1560 (trial counsel argued Dalton was not credible because she made inconsistent statements, she made deliberately false statements, she was biased, she had a bad character, and she had a motivation for fabrication). And trial counsel began his closing argument by asserting, "David Wagner did not commit this heinous crime, and I'm going to be telling you why for, probably, 90 minutes, maybe as long as two hours." Exh B at 1512. Later, counsel argued that the expert psychological evidence was a secondary defense theory. "That's where this comes in, is just in case, for some reason, that you feel that, hey, you know, he did it, which there's no evidence that he did it, there's evidence that he didn't do it and there's way more than a reasonable doubt . . . . [¶] I have to assume that I need to bring these things out, just in case, okay?" Exh B at 1546-1547.
>
> . . . .
>
> In addition, trial counsel was precluded from eliciting testimony from Dr. Kastl that petitioner was incapable of premeditating the attack. Cal. Pen. Code §§ 28, 29; Exh B at 1130. Thus, trial counsel could not have elicited express evidence of that mental limitation.

Answer at 7-10.

In his amended petition, Wagner also set out the facts relating to this claim. As mentioned above, Wagner did not file a traverse. There is nothing in the record that indicates that respondent disputes the underlying course of events relayed by Wagner in the amended petition, which, as augmented by Wagner's arguments in support his ineffective assistance of counsel claim, are as follows:

> 3.   Shortly after petitioner's arrest, his grandfather, Albert Wagner, hired private defense attorney Stephen Tulanian to represent petitioner.
>
> 4.   In March 2005, trial counsel retained psychologist Dr. Albert Kastl to evaluate petitioner and consult with counsel about potential mental health defenses. After reviewing limited discovery materials, Dr. Kastl conducted a psychological evaluation of petitioner on March 24, 2005, for approximately five hours.
>
> 5.   In a written report dated March 31, 2005, Dr. Kastl advised trial counsel that petitioner was severely compromised, but not legally insane, at the time of the alleged offense. Dr. Kastl believed petitioner suffered from a cognitive disorder, polysubstance abuse, and a personality disorder with prominent avoidant, schizoid, and paranoid features. He wrote that obtaining documentation of petitioner's life history, specifically petitioner's school (including Special Education), social security disability, and criminal history records, would be very important in fully assessing petitioner's mental health.
>
> 6.   Despite this request by Dr. Kastl, trial counsel unreasonably failed

9

to investigate petitioner's medical and social history, and made no attempt to obtain the records requested by Dr. Kastl.

7.     Even before counsel received Dr. Kastl's assessment trial counsel knew, or should have known, that petitioner was mentally compromised. Petitioner's statement to the police shortly after he was arrested was audio and video taped. In it petitioner denied any knowledge of how Dalton was injured, but admitted that he had blacked out in the past and it was possible he simply didn't remember attacking Dalton.  Petitioner also revealed that he suffered from a mental disability and was on SSI (Social Security Disability).  He also told police that he had been on antidepressants and had lived in a group home in Sepastopol for four years.

8.     Furthermore, on October 6, 2004, Drena Jensen, an Adult Services Coordinator with the Redwood Coast Regional Center wrote to trial counsel, at petitioner's request, to inform him that petitioner was currently a client of the regional center.  The letter was faxed to trial counsel and then mailed on October 8, 2004.  Trial counsel failed to inform Dr. Kastl that petitioner was a client of the regional center.

9.     Dr. Kastl testified at trial about petitioner's compromised cognitive abilities as they related to his ability to premeditate and plan. Dr. Kastl testified that petitioner's IQ was 74, which put him in the fourth percentile of the general population.  Dr. Kastl also found that petitioner's memory skills were extremely compromised, putting him in the first percentile in terms of his visual and verbal memory capability.  Dr. Kastl testified that petitioner's ability to reason and think was in the first or second percentile, and his ability to plan was markedly deficient. These conditions would have existed at the time of the alleged offense.

10.    On cross-examination, Dr. Kastl testified that the only documents he reviewed were discovery materials produced by the district attorney's office, and two reports regarding petitioner's competency in the instant case.  Dr. Kastl testified that he did not have any independent knowledge of petitioner's history of Special Education other than petitioner's own representation.  Dr. Kastl further testified that he had not read any psychological evaluations of petitioner, even though he had written in his report that it would be extremely helpful to have such evaluations. He did not receive any information regarding petitioner's medical history or history of any psychological or cognitive disorders, nor did he receive any Social Security Disability records.  Dr. Kastl agreed with the district attorney that a complete medical history, as well as a review of other pertinent records would be extremely important in making a correct diagnosis.  On rebuttal, Dr. Kastl testified that he believed he had enough information to make the assertions he testified to during the defense case-in-chief.

11.    During his closing argument, the prosecutor argued that Dr. Kastl had only given petitioner some tests and talked to him for three hours, but had not talked to anyone else, and that the jury thus had not heard from petitioner's family or teachers or anyone else who examined him.  Furthermore, the prosecutor argued that there was no evidence petitioner had ever been previously examined. Therefore, he asserted, the jury should accept the determinations of Drs. Rosoff

10

and Apostle that petitioner was of average or near-average intelligence.[5]

12.   Petitioner was convicted of attempted murder, with the allegation of premeditation and deliberation found true.

13.   Following the jury's verdicts, but before sentencing, petitioner's grandfather had the Redwood Coast Regional Center fax two reports to trial counsel. The first report was a 1994 social assessment of petitioner by Suzette Soviero of the North Bay Regional Center, and the second report was a 1998 psychological evaluation of petitioner by Dr. Michael Pinkston. Both reports stated that petitioner had a history of mental health issues and emotional instability. Upon receiving these reports, trial counsel filed a Motion for New Trial Based on Newly Discovered Evidence and Dr. Kastl was permitted to further evaluate petitioner in light of these two reports and testify as to his findings. The trial court denied the defense motion, finding that Dr. Kastl's testimony did not support the defense proposition that the newly discovered evidence (the two psychological reports) would produce a different result on retrial. Furthermore, the trial court concluded that the reports were not in fact newly discovered evidence and could have been discovered through the reasonable diligence of trial counsel. Trial counsel was put on notice of the existence of such records in March 2005, when Dr. Kastl wrote in his initial report that petitioner was evaluated for SSI and that any reports on petitioner should be obtained. The trial court determined that even without Kastl's letter, diligence would have uncovered the psychological reports.

14.   Post-conviction counsel obtained records pertaining to petitioner from the following places: Analy High School, Greenacre Home, Alta Bates Hospital, Kaiser Permanente Santa Rosa, North Bay Regional Center, Redwood Coast Regional Center, Sutter Medical Center (formerly Community Hospital), and Sonoma County Superior Court.

15.   Trial counsel was ineffective for failing to provide his mental health expert with readily available and relevant records.

16.   Dr. Kastl has reviewed petitioner's medical and social history records collected by post-conviction counsel. Dr. Kastl has concluded that the extent of petitioner's disabilities, and thus his inability to premeditate and plan, cannot be fully understood without considering the impact of his social history. Dr. Kastl also believes that his testimony at trial would have been significantly strengthened had he known of petitioner's history of trauma and abuse, and lifelong struggle with a developmental disability. Dr. Kastl maintains that had he been privy to the information provided by post-conviction counsel he would have been able to contradict the prosecution's assertion that petitioner was of normal intelligence, and would have been able to present to the jury a far more compelling explanation as to why petitioner lacked the ability to premeditate and plan the alleged attack. He also believes that had he been in possession of the

---

[5] Drs. Apostle and Rosoff were appointed to examine Wagner in order to determine his competency pursuant to the California Evidence Code § 730, and they submitted reports to the trial court dated March 9, 2006 and March 10, 2006, respectively. CT 889-896. Both doctors found Wagner competent to stand trial. CT 892, 896. On March 30, 2006, the trial court "considered Dr. Apostle and Dr. Rosoff's reports," and was "satisfied based on [their] reports that the defendant [was] mentally competent" at that time; therefore, "the criminal proceedings [were] not suspended." CT 888.

11

social history materials at the time of trial, he could have presented to the jury a more compelling explanation of the significance of the psychological test results he administered.

17.     A constitutionally adequate investigation of petitioner's social and medical history would have revealed that petitioner is a mentally retarded individual with severely compromised cognitive function. He suffers from an extreme lack of impulse control, which has dominated all aspects of his life from very early childhood throughout his adulthood. He is a victim of severe neglect and abuse, which has further compromised his ability to not only control his physical behavior, but to conduct himself appropriately within the confines of social situations.

. . . .[6]

18.     The prosecution's theory of the case required that petitioner possess the ability to reflect on his situation with Dalton, and then make the cognizant decision to pick up a knife, walk 364 feet to the pay phone, and attack her.

19.     The post-conviction investigation has revealed, however, that petitioner's developmental disability and history of trauma and abuse makes this theory subject to significant doubt. Petitioner suffered from apparent in-utero drug exposure, fetal distress, and trauma throughout his childhood and adolescence. Petitioner was cognitively and mentally compromised from the very beginning of his life, as clearly demonstrated by the severe difficulties he had not only in school, but also in socialization. He was identified as developmentally disabled from a young age and his cognitive disabilities are well documented. Living with such disabilities would be hard enough, but compounding petitioner's situation was the fact that at a crucial time in his emotional development, he fell victim to horrific sexual abuse. These traumatic experiences early in life had a dramatic and detrimental effect on his development. Instead of being raised in a safe, nurturing, or loving environment, petitioner was forced to spend the formative years of his adolescence at a group home. His anger management issues and impulse control disorder are indicative of the long term effects of his upbringing. Petitioner is prone to both depression and substance abuse, and has never learned how to function within societal structures.

20.     While Dr. Kastl testified that he believed that the information he possessed at the time of making this determination at trial was sufficient to support his testimony, he believes that his testimony would have been significantly strengthened had he known of petitioner's history of trauma and abuse, and his lifelong struggle with developmental disability. This is precisely why Dr. Kastl requested additional records and documentation from trial counsel.

21.     Due to trial counsel's failure to provide Dr. Kastl with the appropriate documentation of petitioner's life, the jury did not have the opportunity to hear of petitioner's lifelong struggle with his developmental disability, nor were they privy to the fact that many professionals over the years have found him to be extremely compromised. Such documentation would have substantially reinforced Dr. Kastl's assessment that petitioner was too cognitively deficient to have premeditated and deliberated an attack on Dalton. Furthermore,

---

[6] The court has deleted the sections captioned "Developmental Disability" and "Trauma and Abuse." Am. Pet. Attach. at 7-16.

12

> the jurors heard nothing of petitioner's traumatic childhood and upbringing, specifically the abuse he suffered at the hands of his uncle. As a result, the jury could not evaluate petitioner's culpability in light of his well documented limitations.
>
> 22.  The prosecutor challenged Dr. Kastl's opinion based on the fact that the two doctors appointed to evaluate his competency found him to be of normal intelligence. However, neither doctor completed formal testing of petitioner. Had Dr. Kastl been aware of petitioner's significant history with Special Education and the Regional Center system, he could have challenged their findings. Further, without documentation regarding petitioner's medical or social history, Dr. Kastl's testimony was vulnerable to a strong challenge by the prosecutor as to what elements he used in his assessment of petitioner.

Am. Pet., Attach. at 2-7, 16-18 (footnotes added).

Respondent included in his answer a factual background pertaining to the second motion for a new trial:

> In petitioner's second motion for a new trial, the state trial court reviewed the same "new" evidence petitioner now contends would have changed the result at trial. Exh B (July 6, 2006) at 4-44:
>
> > At trial, Dr. Kastl testified that the defendant did not appear grossly delusional, that he was oriented as to place and person. At trial, he testified that he had enough information available to him from his interview of the defendant on March 24th [2005] and the thoroughness of all these tests that were administered to render a competent opinion about the defendant's ability regarding reasoning and planning; . . . [and] that it would be helpful to have additional information but that not being available, he had enough information to reach his conclusions at trial.
> >
> > So at trial, he's basically saying he had enough to render competent opinions. Now he's testifying on the second motion for new trial that he didn't have enough. That undercuts his opinion on -- as expressed in this second motion for new trial.
> >
> > His opinion is also, in the Court's view, undercut by the videotaped interview of the defendant by Detective Bell, Exhibit 35. That videotape shows that defendant was oriented as to time, person, and place; that he was responsive to questions asked; that he was not cowed or led into incriminatory responses; showed that he had an ability to form a motive and plan goal directed activity. Exh B (July 6, 2006) at 33-34.
>
> The trial court also noted that the videotape demonstrated that petitioner knew the difference between right and wrong, truth and lies. Exh B (July 6, 2006) at 34-36. It found that Dalton was credible and even petitioner corroborated her in many ways. Id. at 37. It also found the finding of premeditation was supported by extensive evidence of motive, prior planning, and an intentional method of assault. Id. at 38-43. After listing the evidence over five pages of transcripts, the trial court concluded, "they all add up to the conclusion that the mental states here were shown." Id. at 43. The court found there was "also additional circumstantial evidence of the mental states in issue . . . [including] the concealment of the knife after the stabbing . . . ." Id. "So based upon all of that foregoing reasoning, I

13

> cannot conclude that the newly discovered evidence would probably produce a different result on retrial." Id.

Answer at 12-13.

### B. Applicable Federal Law

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. If a petitioner cannot show prejudice, then the court need not consider whether counsel's performance was deficient. See Williams v. Calderon, 52 F.3d 1465, 1470, n.3 (9th Cir. 1995).

A lawyer need not file a motion that he knows to be meritless on the facts and the law. See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) ("to show prejudice under Strickland from failure to file a motion, [a petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him"); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (failure to file suppression motion not ineffective assistance where counsel investigated filing motion and no reasonable possibility evidence would have been suppressed); see also Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action can never be deficient performance).

C.     Analysis

Wagner claims that trial counsel's failure to adequately prepare Dr. Kastl constitutes ineffective assistance, stating:

> 23.    No tactical reason exists for trial counsel's unreasonable failure to investigate, discover, introduce at trial, and inform petitioner's expert witness of evidence of petitioner's history of developmental disability, medical and psychological trauma, and history of abuse. Dr. Kastl specifically identified and asked for particular records, and trial counsel's failure to investigate in this regard constitutes constitutionally inadequate assistance of counsel.
>
> 24.    Petitioner was prejudiced by this inadequate assistance of counsel in that it effectively deprived him of a viable defense to the claim that he premeditated and deliberated the attempted murder of Dalton. Absent trial counsel's errors and omissions, it is reasonably probable that the jury would have returned a verdict more favorable to petitioner.

Am. Pet., Attach. at 19.

To establish his entitlement to relief on the ineffective assistance of counsel claim, Wagner must show that, had his trial counsel provided Dr. Kastl with his historical psychological reports, then these additional reports would have enabled Dr. Kastl to more convincingly testify that Wagner did not premeditate the attempted murder, and a reasonable probability that the result of the proceedings would have been different.

Respondent argues that Wagner can show neither deficient performance of counsel nor prejudice based on trial counsel's failure to prepare Dr. Kastl. This Court finds respondent's argument concerning deficient performance wanting, but agrees that Wagner cannot show prejudice.

Respondent argues:

> Trial counsel made a reasonable tactical decision to emphasize an identity defense rather than admitting petitioner committed the assaults without criminal intent. Moreover, Dr. Kastl had sufficient background information and current exam results to conclude that petitioner did not premeditate the stabbing. Therefore, trial counsel's efforts were more than adequate to support the desired testimony.
>
> Furthermore, Dr. Kastl was legally precluded from testifying that petitioner did not premeditate the attempted murder. So the evidence of mental deficiency Dr. Kastl already had went beyond the scope of permissible testimony. Therefore, trial counsel had no compelling reason to seek out additional evidence -- especially since that evidence might undermine Dr. Kastl's evaluation.
>
> Similarly, there was no need for further investigation because the mental

15

> deficiency defense conflicted with the identity defense since it implicitly acknowledged that petitioner was the assailant. Therefore, trial counsel had no reason to devote substantial resources to that investigation because he could not emphasize that evidence without undermining the primary defense theory. Finally, once the jury determined that petitioner committed the crimes charged, it necessarily accepted a cluster of evidence that overwhelmingly demonstrated that petitioner did, in fact, premeditate the attempted murder. Therefore, petitioner can show neither deficient performance of counsel nor prejudice.

Answer at 4-6. This court disagrees that counsel's failure to obtain and provide to Dr. Kastl the readily available reports and records concerning Wagner's development was reasonable. Having determined to hire "an expert, Dr. Kastl, who interviewed the defendant, conducted tests, and later testified for the defense at trial," Cal. Sup. Ct. Opinion at 2, counsel should reasonably have provided the expert with all readily available mental health records. While Dr. Kastl nevertheless reached a diagnosis that was favorable to the defense and concluded that petitioner could not have premeditated an attack on the victim, it would have been buttressed by further information, as the expert himself testified.

However, the Court agrees with respondent and the Superior Court that Wagner cannot show prejudice. As a preliminary matter, counsel's primary defense was mistaken identity; cognitive impairment was treated as a backup. Further, as the trial court noted, the evidence of Wagner's premeditation was extensive. Resp't Ex. B (July 6, 2006) at 38-43. Specifically, during the hearing on the second motion, the trial court indicated that "[i]n so far as the law on premeditation and deliberation, the cases tell us you look at motive plus prior planning plus manner of attempted killing." Id. at 38. That court added: "You look at those three factors in determining whether there's been a demonstration of premeditation and deliberation. And I think you can also look at those things in terms of the other mental states at issue here." Id.

First, the trial court determined that Wagner had motive:

> So this all tells us about the motive, that the defendant had wanted Paris Dalton to move out of unit No. 13 because his grandfather owned it and that his grandfather did not allow him to have renters; that his grandfather was coming up the next day; that it was imperative that the defendant move the victim out or his grandfather would take unit No. 13 away from him.
>
> In addition, the defendant and Paris Dalton had been involved in this knock down drag out fight because she wouldn't move out, and that just served to make him even more angry. And, in addition, he felt that she was calling the police. So this is all the motive that led up to what happened.

16

Id. at 40-41.

The trial court also analyzed Wagner's prior planning activity, stating:

> . . . clearly the defendant, according to this evidence, picked up the knife in unit 13. He realized that it could be used to kill. He was aware that stabbing someone in the back and cutting someone's throat could kill them. He walked for this substantial distance with the knife in his hand. He didn't assault just someone at random but rather he chose to assault someone who was threatening his lifestyle, who would not follow his directions, and who had fought with him. So this isn't like the example of the assailant thinking he's breaking a jar when in reality it's a homicidal act.

Id. at 41.

Finally, the trial court looked at the manner of attempted killing, as follows:

> . . . Paris Dalton says she looked and saw the defendant coming to the phone booth; that the defendant got up to the phone booth and asked who she called and she said, "I tried to call my girlfriend, but she was not at home"; that the defendant then said, "Come home and it will be okay"; that then she felt the knife go in her back. He was behind her when she felt the impact to her back. She then grabbed her back, sat down. She says the defendant then cut her throat. She told the defendant she thought she'd bleed to death if she didn't go to the hospital. And the defendant said, "Let me call the ambulance," "If I told them that the defendant did not do this." So he said he'd call the ambulance if she would say he didn't do it, that she was to say that he had just rescued her, and she said okay.
>
> We have another independent witness, fellow by the name of -- a person by the name of Arbon Barbow, who says that Ms. Dalton stated her roommate stabbed her in the back and cut her throat.
>
> We have the testimony of Dr. Schug probing the stab wound as being 2 plus inches in depth; that the victim had a collapsed lung; that the wound entered the chest cavity and the lung and liver surround that particular injury; that the back injury, if untreated, is potentially a life threatening injury because of the injuries to the lung; that the victim also had a 3 1/4 inch cut on her neck. The structures in that area are the trachea windpipe, jugular vein, and carotid artery, and that that neck wound was within one half inch of both the windpipe and the jugular vein. If that vein had been cut and untreated, death would occur within minutes. If the trachea were cut, blood would flow into the lungs and stop the lungs from transporting oxygen. So that's a life threatening injury.
>
> So we're not talking about a stab to the hand or to the ankle or to the knee. We're talking about areas that everyone, and I conclude also the defendant, understood were vital areas. So that's the manner of the attempted killing.

Id. at 42-43. After evaluating the aforementioned three factors, the trial court denied the second motion for a new trial as follows:

> When you look at these three factors, motive, prior planning activity, manner of the attempted killing, they all add up to the conclusion that the mental states here were shown.

17

> There's also additional circumstantial evidence of the mental states in issue in that the concealment of the knife after the stabbing and slashing. Clearly certain materials in unit No. 13 were used to conceal the knife involved in this case. And that was found about -- well, over 700 feet from unit 13. So that's also showing the state of mind here.
>
> I might also point out that a finding of premeditation and deliberation as I understand the law is not dependent upon the defendant having in mind all of the possible consequences at the time of the assault. And I also don't feel that the conduct of the victim here was sufficiently provocative that would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.
>
> So based upon all of that foregoing reasoning, I cannot conclude that the newly discovered evidence would probably produce a different result on retrial. Therefore, this second motion for new trial is denied.

Id. at 43-44. In rejecting Wagner's ineffective assistance of counsel claim on state habeas review, the state superior court acknowledged that his trial counsel "unsuccessfully moved for a new trial," as explained above. Cal. Sup. Ct. Opinion at 2. The state superior court denied habeas relief because it found that trial counsel's actions were "what would be expected of a competent defense counsel." Id.

Assuming arguendo that trial counsel provided incompetent assistance, there was no prejudice because it is not reasonably probable that Dr. Kastl -- had he received the additional historical psychological reports -- could have done more to persuade the jury that Wagner did not premeditate the crimes. As discussed above, Dr. Kastl was precluded by law (and the trial court) from testifying that Wagner did not premeditate the crimes. Cal. Pen. Code §§ 28, 29; RT 1130. Therefore, Dr. Kastl's ability to testify about Wagner's ability to premeditate or form the intent to kill was limited. Accordingly, trial counsel used Dr. Kastl's testimony in his closing argument sparingly because he was raising a technical legal defense that contradicted his main factual defense, stating the following:

> And what [Dr. Kastl] says, essentially, is this man is at the low -- lowest level you can be in, in being able to plan these things out, such as an intent to kill or an intent to permanently disfigure, in Court Two, the mayhem charge.
>
> They go to whether [Wagner] premeditated or deliberated over this. That's an important thing. If he did it, which he didn't, then you'd have to determine this: Did he have the intent to kill in Court One? No. Did he have the well, did he form, in his mind, deliberate, or premeditate? No, he didn't.

18

> We know he didn't because of the circumstances here. There wasn't enough time to, except counsel wants to say he walked for a football field's distance with this knife, which there's no evidence of. But he doesn't have the cognitive ability to form these kinds of intents, ultimately. He's not just that kind of person. That's why Dr. Kastl was called. Be that as it may, we don't even have to go there with Dr. Kastl.

RT 1547-1548.

This court cannot find that the technical legal defense -- Wagner's mental limitation defense -- had a reasonable probability of success. Once the jury rejected Wagner's main identity defense or actual innocence defense, the evidence of premeditation was extensive. Since Wagner cannot show a reasonable probability of a more favorable result, thus, there was no prejudice. See Strickland, 466 U.S. at 694.

In sum, Wagner has not established ineffective assistance of counsel under the Sixth Amendment, nor has he shown that the state superior court's rejection of his claim was objectively unreasonable. See Terry, 529 U.S. at 409; see also Bell v. Cone, 535 U.S. 685, 698-99 (2002); Yarborough v. Gentry, 540 U.S. 1, 6 (2003).

Accordingly, Wagner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claim[] debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Wagner may seek a certificate of appealability from the Ninth Circuit Court of Appeals. The clerk shall enter judgment in favor of respondent, and close the file.

The court also directs the clerk to substitute Warden Randy Grounds as the respondent in this action. See supra note 3.

IT IS SO ORDERED.

DATED: November 22, 2011

SUSAN ILLSTON
United States District Judge